**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Christine Woodward, | ) | Civil Action No. 2:09-2933-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

On November 10, 2009, Plaintiff Christine Woodward filed the within action pursuant to 42 U.S.C. §§ 405(g) and 1621(c)(3) of the Social Security Act, as amended (the "Act") seeking judicial review of a final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's claims for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Act. In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Robert S. Carr for pretrial handling. On June 10, 2010, Plaintiff filed her brief addressing the issues in the case. On July 21, 2010, Defendant filed a Memorandum in Support of the Commissioner's Decision. On October 29, 2010, the Magistrate Judge filed a Report and Recommendation recommending that Defendant's decision to deny benefits be reversed and remanded under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) for a "full[] evaluation [of] the plaintiff's complaints of pain and credibility as well as to review the plaintiff's functional capacity, functional limitations, and the testimony of the vocational expert in a manner consistent with Social Security regulations and rulings." Report and Recommendation at 9. On November 10, 2010, the Commissioner filed objections to the Report and Recommendation contending that the Commissioner's final decision is supported by substantial

evidence and should be affirmed.  Def. Obj. at 1.

The Magistrate Judge makes only a recommendation to this court.  The recommendation has no presumptive weight.  The responsibility for making a final determination remains with this court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976).  The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).  The district court is obligated to conduct a *de novo* review of every portion of the Magistrate Judge's report to which objections have been filed.  *Id.*

## I. FACTS

On March 27, 2006, Plaintiff filed applications for DIB and SSI, alleging disability beginning on April 11, 2004.  R. at 98-109.  Plaintiff alleges she is disabled due to chronic obstructive pulmonary disease ("COPD"), obstructive sleep apnea, obesity, hearing loss, asthma, diabetes mellitus, and diabetic neuropathy.  R. at 52, 53, 178.  On September 27, 2006, Plaintiff's claims were denied.  R. at 48, 50.  On March 12, 2007, Plaintiff's claims were denied again upon reconsideration.  R. at 52, 54.  On May 7, 2007, Plaintiff timely requested a hearing on her applications.  R. at 71.  On May 18, 2009, a hearing was held before an administrative law judge ("ALJ") at which Plaintiff and a vocational expert ("VE"), testified.  R. at 23-24.  On July 21, 2009, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  R. at 6, 22.  On September 25, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.  R. at 1.  As a result, the ALJ's decision became the final decision of Defendant.  R. at 1.

**A.    Plaintiff's Medical Records**

On April 10, 2004, Plaintiff had a laryngoscopy to assess the degree of inhalation injury she

had sustained in a gasoline flash explosion at work. R. at 182. It was determined that Plaintiff had a moderate inhalation injury, and severe facial and upper extremity burn injuries. *Id.* On April 27, 2004, Plaintiff had a follow-up exam to check her lungs after the gas explosion. R. at 209. It was noted that Plaintiff had a significant history of tobacco abuse and asthma, and that Plaintiff felt her breathing worsened after the accident. *Id.* Plaintiff was prescribed Advair, Combivent and Prednisone. *Id.* Plaintiff's weight was recorded as 303.6 pounds. *Id.* On May 28, 2004, Plaintiff had another follow-up exam for her burn injuries. R. at 207. Dr. James N. Moore ("Moore") of Family MedCenters of Aiken, Plaintiff's primary physician, noted that Plaintiff was doing better, but was wheezing when she breathed. *Id.*

On February 8, 2005, Moore diagnosed Plaintiff with bronchitis for which she was given Prednisone. R. at 206. On December 16, 2005, Plaintiff went to Family MedCenters of Aiken because she had pain in her lower back and stomach, difficulty breathing, and headaches. R at 205. Plaintiff was diagnosed with bronchitis, COPD, and diabetes mellitus, type II. *Id.* Moore's progress notes from January 13, 2006 indicate that Plaintiff was having difficulty breathing, and had neuropathy in her feet, which was not being alleviated by Plaintiff's prescription for Neurontin. R. at 204. Plaintiff was given an increased dosage of Neurontin and was given prescriptions for Cymbalta and Quinine. *Id.* Plaintiff's prescriptions for Advair and Metformin, which are for COPD and diabetes respectively, were also increased. *Id.* Moore's progress notes from February 14, 2006 indicate that Plaintiff was experiencing side effects from Metformin, and was having trouble with her neuropathy. R. at 203. Plaintiff's Metformin dose was reduced, and her Neurontin dose was increased to address these issues. *Id.*

Moore's progress notes from March 24, 2006 indicate that Plaintiff had bronchitis, and that

3

Plaintiff's diabetes and hypertension were under control. R. at 202. Plaintiff was continued on Cymbalta for depression and Advair for COPD. *Id.* Plaintiff's Neurontin dose was increased to address continued trouble with neuropathy. *Id.* On April 7, 2006, Moore again diagnosed Plaintiff with bronchitis. R. at 201. Moore noted that Plaintiff's diabetes mellitus and hypertension were under control, but that Plaintiff required an increased dose of Neurontin for her neuropathy. R. at 201.

On May 23, 2006, Plaintiff reported to Family MedCenters of Aiken because she was having trouble sleeping, for which she was prescribed Trazodone. R. at 214. Plaintiff also reported that Neurontin was helping her neuropathy and that her pain was better. *Id.* On June 30, 2006 Plaintiff returned to Family MedCenters of Aiken and reported that Trazodone was helping her sleep, but that she was having problems with her feet due to neuropathy. R. at 213.

On August 25, 2006, Plaintiff presented to Graniteville Family Medical Center complaining of diabetes, neuropathy and asthma. R. at 224. Plaintiff's weight was recorded as 284 pounds. *Id.* It was noted that Plaintiff's gait was intact and that Plaintiff did not use mobility aids. R. at 227. With regard to Plaintiff's extremities, Plaintiff was found to have a full range of motion with normal stability, strength and tone. *Id.* It was also noted that Plaintiff had reduced touch sensation in both lower extremities, but that her pinprick sensation was normal. *Id.* Plaintiff had a mildly depressed affect. R. at 228. Plaintiff was diagnosed with asthma, COPD secondary to tobacco use, non-insulin dependent diabetes mellitus type II, peripheral neuropathy secondary to diabetes, chronic leg cramps, obesity, tobacco abuse, and depression. *Id.* Dr. Mae Jean Englee, M.D. ("Englee") concluded based upon this examination that Plaintiff had symptoms and signs of chronic lung disease, made worse by her continued smoking. *Id.* Englee noted that Plaintiff's medical records from her primary care

physician indicated that Plaintiff's hypertension and diabetes were under control, but that Plaintiff's neuropathy was not. *Id.*

On September 26, 2006, Edward Waller ("Waller") completed a psychiatric review of Plaintiff based upon her medical records. R. at 229. He determined that Plaintiff suffers from depression, but that her impairment was not severe. *Id.* Waller stated that Plaintiff's depression did not limit Plaintiff's activities of daily living, but that the depression mildly limited Plaintiff in maintaining social functioning and maintaining concentration, persistence or pace. R. at 239. On September 27, 2006, William Lindler ("Lindler") completed a physical residual functional capacity ("RFC") assessment of Plaintiff in which he concluded that Plaintiff was capable of medium work. R. at 243-250.

On October 23, 2006, Plaintiff presented to Family MedCenters of Aiken complaining of a cough, neck pain, and difficulty walking at times. R. at 259. Plaintiff was diagnosed with bronchitis. *Id.* On December 21, 2006, Plaintiff complained to Moore of lightheadedness, leg pain, and numbness in her hands. R. at 257. Moore gave Plaintiff a prescription for a higher dose of Neurontin. *Id.* On January 12, 2007, Plaintiff had an appointment with Moore to address cramping in her hands and stomach. R. at 258. Plaintiff was advised to quit smoking and continue with Advair for her COPD. *Id.* On January 22, 2007, Plaintiff went to the Family MedCenters of Aiken for shoulder pain. R. at 256. Plaintiff indicated that she had sustained a fall the day before, but that the shoulder pain had been present since October. *Id.*

On March 9, 2007, Dr. Samuel Goots ("Goots") affirmed Waller's assessment that Plaintiff's depression did not constitute a severe impairment. R. at 148. On March 27, 2007, Dr. Richard T. Thio, M.D. ("Thio") reviewed Lindler's physical RFC assessment and agreed with Lindler's

5

conclusion that Plaintiff could perform medium work. R. at 262.

On May 1, 2007, Plaintiff underwent a hernia repair. R. at 303. On May 5, 2007, Plaintiff went to the emergency room complaining of post operative pain. R. at 307. Plaintiff was given a prescription for the pain and advised to contact Moore for a followup visit in three to five days. *Id.* Plaintiff was also advised to quit smoking. *Id.*

On May 18, 2007, Plaintiff saw Dr. Angela Zaremba ("Zaremba") for diabetic foot care. R. at 451. Plaintiff declined a cortisone shot for pain and was continued on conservative care, which involved diabetic footwear. *Id.*

On May 22, 2007, Plaintiff told Moore that she felt depressed easily. R. at 288. Plaintiff was given a prescription for an increased dose of Cymbalta. *Id.* On June 19, 2007, Plaintiff went to Family MedCenters of Aiken and reported that Cymbalta did not help with her depression and that she had difficulty sleeping. R. at 289 Plaintiff was given another prescription for an increased dose of Cymbalta. *Id.* Moore's progress notes for Plaintiff from July 17, 2007 indicate that Plaintiff complained of pain in her hips, abdomen, chin and cheeks, and of muscle spasms. R. at 290. Moore referred Plaintiff to a Dr. Terry for muscle spasms and ordered a CT scan of Plaintiff's head. *Id.* Moore also filled out a physician's statement for Plaintiff's application for a handicapped placard, in which he stated that Plaintiff had a permanent impairment in her mobility. R. at 268.

From July 17 to 18, 2007, Plaintiff had a nocturnal polysomnogram from which it was concluded that Plaintiff had obstructive sleep apnea, periodic limb movement, and difficulties initiating and maintaining sleep. R. at 279. On July 26, 2007, Plaintiff's CT scan results came back normal. R. at 280.

On September 20, 2007, Plaintiff had an Upper GI endoscopy. R. at 333. It was concluded

that Plaintiff had reflux esophagitis, gastritis, duodenitis, and esophageal mucosal changes consistent with Barrett's esophagus, which is related to cancer. *Id.* Plaintiff was prescribed Nexium for her gastritis. *Id.* That same day, Plaintiff had an appointment with Zaremba during which Plaintiff reported that Metanx helped with her neuropathy. R. at 452. Zaremba noted that Plaintiff was "sensorum diminished" due to numbness, burning, and tingling. *Id.* Plaintiff was "advised" about "limited ambulation and elevation." *Id.*

A CPAP report dated October 2, 2007 concluded that Plaintiff's obstructive sleep apnea was corrected with CPAP. R. at 461-62. On November 9, 2007, Plaintiff presented to Moore complaining of wheezing, shortness of breath, a cough, chills, and worsening neuropathy in her hands. R. at 343. Assessment revealed COPD exacerbation for which Prednisone and Avelox were prescribed. *Id.* Plaintiff was continued on Cymbalta and given Lyrica instead of Neurontin for her neuropathy. R. at 343.

On November 29, 2007, Plaintiff again reported to Zaremba that Metanx helped with the neuropathy. R. at 453. Zaremba noted that Plaintiff was "sensorum diminished" and advised Plaintiff about "limited ambulation and elevation." *Id.*

On December 4, 2007, Plaintiff told Moore that she wanted to quit smoking and that she needed a higher dose of Lyrica because it was not helping her pain from her neuropathy. R. at 346. Plaintiff was given a higher dose of Lyrica and started on Chantix to help her quit smoking. *Id.* Moore's notes from January 22, 2008 indicate that Plaintiff was restarted on Neurontin, and that Chantix was helping Plaintiff reduce her smoking. R. at 394.

Zaremba's notes from Plaintiff's visit on February 7, 2008 indicate that Metanx continued to help Plaintiff with neuropathy. R. at 454. However, Plaintiff continued to be sensorum

diminished and Zaremba again advised Plaintiff about limiting her ambulation and about elevation. *Id.*

Moore's notes from February 19, 2008 indicate that Plaintiff wanted to try Elavil instead of Cymbalta to help her with her neuropathy and sleeping while she was on Neurontin. R. at 403. Plaintiff's Cymbalta dosage was decreased and Plaintiff was given a prescription for Elavil. *Id.*

On May 14, 2008, Plaintiff had another Upper GI endoscopy from which it was determined that Plaintiff had Barrett's esophagus, acute gastritis without hemorrhage and duodenitis without hemorrhage. R. at 386. Plaintiff was advised to use Nexium. *Id.* The pathology report from the endoscopy revealed chronic active gastritis and intestinal metaplasia. *Id.*

Zaremba's progress notes from May 27, 2008 indicate that Metanx was helping with Plaintiff's neuropathy, but that Plaintiff was still sensorum diminished in her hands and legs. R. at 455. Zaremba again advised Plaintiff about limited ambulation and elevation. *Id.* The next day, on May 28, 2008, Plaintiff reported to her gastroenterologist, Dr. Leavens, that she was taking her Nexium and doing well with her reflux disease. R. at 391.

On August 5, 2008, Plaintiff reported to Zaremba that Metanx continued to help her with neuropathy. R. at 456. Zaremba noted, however, that Plaintiff continued to be sensorum diminished in her hands and legs and advised Plaintiff about limited ambulation and elevation. R. at 456.

On August 27, 2008, Plaintiff had an audiogram. R. at 427. On September 9, 2008, Dr. Anthony E. Harris examined Plaintiff's audiogram and found that Plaintiff had sensorineural hearing loss in both ears; mild to moderate in the right ear, and mild in the left ear. R. at 421. Plaintiff was told she could look into getting hearing aids and that she should have her hearing rechecked in six months. *Id.*

Moore's progress notes from Plaintiff's office visit on September 30, 2008 indicate that Plaintiff continued to have trouble with sleeping and neuropathy. R. at 433. Plaintiff was continued on Cymbalta and Neurontin, and Plaintiff's dose of Elavil was increased. *Id.*

On October 24, 2008, Plaintiff reported to Zaremba that Metanx was still helping with her neuropathy. R. at 456. Zaremba noted that Plaintiff's motor reflexes were present and symmetrical, but that Plaintiff was sensorum diminished in her hands and legs. *Id.* Plaintiff was once again advised about limited ambulation and elevation. R. at 456. On January 9, 2009, Plaintiff again reported to Zaremba for diabetic foot care. R. at 457. Plaintiff indicated that Metanx was still helping with the burning in her feet, and was advised about limited ambulation and elevation. *Id.* On March 24, 2009, Plaintiff reported to Zaremba that there was no improvement to the pain in her feet. R. at 458. Zaremba advised Plaintiff about weight management, exercise and quitting smoking. *Id.* Zaremba also reviewed diabetic foot care with Plaintiff, advising her as to appropriate shoe gear and "self care." *Id.* Plaintiff was continued on Metanx. *Id.*

On April 1, 2009, Plaintiff had an Upper GI endoscopy, from which it was concluded that Plaintiff had Barrett's esophagus, acute gastritis without hemorrhage and duodenitis without hemorrhage. R. at 443. Plaintiff was advised to continue using Nexium. *Id.*

On April 26, 2009, Plaintiff reported to Zaremba that she was still experiencing numbness, burning, and tingling in her hands and legs. R. at 460. Zaremba noted that Plaintiff's motor reflexes were present and symmetrical, Plaintiff's muscles strength was 5/5 bilaterally, and Plaintiff's range of motion was within normal limits in her ankles and feet. *Id.* Plaintiff and Zaremba discussed using diabetic shoes and insoles, as well as a proper diet and exercise. R. at 459. Plaintiff was also advised as to the use of ice, massage, and MT pads. *Id.*

9

**B.**     **Hearing Testimony**

At her hearing before the ALJ, Plaintiff testified that that she believes she cannot work because of asthma and the neuropathy in her hands and feet.  R. at 30.  Plaintiff specifically noted that her neuropathy had gotten worse, which made it hard for her to stand or sit for long periods of time, and to pick up objects because she drops things easily.  *Id.*  Plaintiff testified that the neuropathy is worse in her left hand and left foot than in her right hand and right foot.  R. at 32.  Plaintiff testified that she can sit at any one time for about an hour, stand for thirty to forty minutes before her legs start going numb, and walk about ten minutes before she will be out of breath and her legs will be burning and numb.  R. at 34.  Plaintiff testified that she does not use any assistive devices to stand or walk.  R. at 42.  Plaintiff also testified that the side effects from Neurontin have caused her to fall down in the past and that, as a result, someone is always with her during the day.  R. at 33, 35.  Plaintiff indicated that she spoke with her doctor about falling down.  R. at 33.

With regard to her asthma, Plaintiff testified that she has not been to the hospital for asthma since 1983.  R. at 31. Plaintiff also testified that although she uses a CPAP machine for sleep apnea, it does not help because her asthma causes her to "wake up in the middle of the night coughing and choking."  R. at 33.

Plaintiff testified that her daily activities include some housekeeping during the day, making dinner, and spending a total of about thirty minutes gardening.  R. at 35.  Plaintiff testified that her household chores include making beds, washing clothes, doing the dishes, and picking up her grandchildren's toys.  R. at 37. Plaintiff also testified that she can feed, dress, bathe, and shower herself.  R. at 40.  When asked if any doctors had placed any limitations on what Plaintiff could do, Plaintiff testified that she was advised to not go camping "because of the odors and the heat."  R. at

42.

Although Plaintiff testified that she does not receive injections for pain and does not receive any physical or occupational therapy for pain, she does take pain medication.  R. at 41; *see also* R. at 417, 458.  Plaintiff testified that she does not receive any mental health treatment.  R. at 42.

The ALJ posed the following hypothetical question to the VE:

I'm going to ask you to assume hypothetically the Claimant is 42 years of age. She has performed the past relevant work as outlined in your testimony.  She has the skills that you have identified in your testimony.  Objectively the record would show a morbid obesity, a history of ingrown toenails, a hearing loss which does not result in any vocational limitations, chronic obstructive pulmonary disease, asthma, obstructive sleep asthma, excuse me, obstructive sleep apnea with a CPAP, history of a ventricle hernia, chronic anemia, non-insulin dependence [sic] diabetes mellitus with neuropathy, a history of migraine headaches, and a mild depression. Subjectively, she has testified to pain, primarily in the feet and hands, a limited ability to sit, stand, and walk, a loss of memory, fatigue, weakness, inability to sleep, neuropathy in both the feet and the hands.  I want to ask you to assume the Claimant's age, education, and work background, the Claimant's objective impairments, and subjective complaints in combine [sic] would reduce her residual functional capacity, but would allow exertionally and non-exertionally the ability as follows.  She could lift 20 pounds occasionally and 10 pounds frequently, sit six of eight hours, stand and walk two of eight hours.  She does not require an assistive device.  As far as pushing and pulling she should avoid foot pedals.  She could occasionally climb, balance, stoop, kneel, crouch, and crawl.  She could not engage in ropes, ladders, and scaffolds.  She has no limitations on reaching, handling, fingering, and feeling.  The potential for daytime somnolence would preclude working around heights or dangerous moving machinery.  She should avoid extremes of temperature and humidity, and her respiratory problems would preclude working around excessive dust, fumes, and chemicals.  She has no significant mental limitations.

. . .

[W]ould there be any semi-skilled jobs that would exist in the state or national economy to which any previously acquired skills would be transferable?

R. at 44-45.  The VE testified that Plaintiff could perform the jobs of telephone operator, appointment clerk, and circulation clerk.  R. at 45.  These jobs are sedentary semi-skilled jobs.  R.

at 46.

**C.     ALJ's Decision**

The ALJ made the following findings in his decision denying benefits:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since April 11, 2004, the alleged onset date (20 CFR 404.1571, *et. seq.*, and 416.971 *et. seq.*).

3. The clamant has the following severe impairments: obesity, chronic obstructive pulmonary disease (COPD), and non-insulin dependent diabetes mellitus with neuropathy (20 CFR 404.1520(c) and 416.920(c)).

4. The clamant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 419.967(a) with the followings [sic] restrictions: lifting and/or carrying no more than 10 pounds occasionally and less than 10 pounds frequently; sitting a total of 6 hours in an 8-hour workday; standing and/or walking a total of 2 hours in an 8-hour workday; no pushing/pulling of foot pedals; occasionally climbing ramps and stairs; no climbing of ropes, ladders, or scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; avoiding exposure to heights and moving machinery due to potential day time somnolence; avoiding exposure to extreme temperatures or extreme humidity; and avoiding exposure to dust, fumes and chemicals.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 19, 1966 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability

because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 11, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

R. at 11, 13, 14, 20, 21.

The ALJ's decision indicated that he considered all of Plaintiff's symptoms to the extent they could reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. 404.1529 and 416.929. R. at 14. The ALJ considered a Collateral Questionnaire that was completed by Plaintiff's daughter regarding Plaintiff's daily activities and condition, but determined that the Collateral Questionnaire merited little weight because "the medical and other evidence of record as a whole [did] not support such significant limitations on [Plaintiff]'s activities of daily living." *Id.*

The ALJ also considered Plaintiff's testimony. R. at 15. The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [] residual functional capacity assessment." R. at 15. The ALJ stated that: "[t]he medical evidence in this case doe [sic] not reveal significant objective medical evidence of 'severe' impairments reasonably expected to cause the pain the claimant alleges she suffers." R. at 18. The ALJ concluded that: "[t]he claimant's alleged pain

is disproportionate to the medical evidence of record." *Id.*

In making this determination, the ALJ considered Plaintiff's medical records, the opinions of Waller and Goots as to Plaintiff's mental limitations, and the opinions of Lindler and Thio regarding Plaintiff's physical RFC, as well as Moore's opinion that Plaintiff has an impairment in her mobility. R. at 15-18. The ALJ explained that Plaintiff's claims that the neuropathy in her hands and feet causes Plaintiff's legs to go numb and burn, and sometimes to fall down, were not consistent with the medical evidence. R. at 18-19. The ALJ reasoned that Plaintiff had reported to Zaremba that Metanx helped with the burning, and Plaintiff was not prescribed any pain medications for her neuropathy. *Id.* The ALJ also noted that Plaintiff's medical records indicate that she never reported any "significant falls to any medical professional." R. at 19. The ALJ afforded great weight to the opinions of Waller and Goots that Plaintiff's mental impairment due to depression was not severe because these opinions were consistent with the record as a whole. R. at 19. The ALJ did not give significant weight to the opinions of Lindler and Thio that Plaintiff retained the RFC to perform medium work because these opinions were not based upon the full record. *Id.* The ALJ also explained that he did not afford great weight to Moore's opinion that Plaintiff has a permanent disability based upon a mobility impairment because Moore's opinion dealt with an issue reserved for the Commissioner and did not deal with work-related functional limitations. R. at 19-20.

## II. STANDARD OF REVIEW

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as

more than a scintilla, but less than a preponderance." *Thomas v. Celebrezze,* 331 F.2d 541, 543 (4th

Cir. 1964). This standard precludes a *de novo* review of the factual circumstances that substitutes

the court's findings for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971).

The court must uphold the Commissioner's decision as long as it is supported by substantial

evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). "From this it does not follow,

however, that the findings of the administrative agency are to be mechanically accepted. The

statutorily granted right of review contemplates more than an uncritical rubber stamping of the

administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). "[T]he courts must not

abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound

foundation for the [Commissioner's] findings, and that his conclusion is rational." *Vitek*, 438 F.2d

at 1157-58.

The Commissioner's findings of fact are not binding if they were based upon the application

of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). However, the

Commissioner's denial of benefits shall be reversed only if no reasonable mind could accept the

record as adequate to support that determination. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

### III.  THE APPLICABLE LAW AND REGULATIONS

The Social Security Act provides that disability benefits shall be available to those persons

insured for benefits, who are not of retirement age, who properly apply, and who are "under a

disability." 42 U.S.C. § 423(a). Disability is defined in 42 U.S.C. § 423(d)(1)(A) as: "[the] inability

to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months."

The Social Security Act has, by regulation, reduced the statutory definition of "disability" to a series of five sequential questions that are to be asked during the course of a disability determination. The five questions are: (1) is the claimant engaged in substantial gainful activity; (2) does the claimant have a severe impairment or combination of impairments; (3) does the claimant have an impairment that meets or equals one of the listings in the appropriate appendix; (4) is the claimant prevented by the impairment or combination of impairments suffered from engaging in his or her relevant past employment; and (5) does the claimant have the ability to engage in other gainful activity considering his or her age, education, past relevant experience, and residual functional capacity. *See* 20 C.F.R. § 404.1520 (2007).

An individual may be determined not disabled at any step if found to be: gainfully employed, not severely impaired, not impaired under the Listing of Impairments, or capable of returning to former work. In such a case, no further inquiry is necessary. If, however, the claimant makes a showing at Step Four that return to past relevant work is not possible, the burden shifts to the Commissioner to come forward with evidence that the claimant can perform alternative work and that such work exists in the national economy. *Harper v. Bowen*, 854 F.2d 678, 679-80 (4th Cir. 1988); *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987). The Commissioner may meet this burden by relying on the Medical-Vocational Guidelines (the "Grids") or by calling a vocational expert to testify. 20 C.F.R. § 404.1566. The Commissioner must prove both the claimant's capacity and the job's existence. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

IV. <u>DISCUSSION</u>

**A.    Plaintiff's Credibility**

The Commissioner objects to the Magistrate Judge's conclusion that the ALJ's credibility

16

determination was deficient, arguing that the ALJ made a proper credibility determination, which was supported by substantial evidence. *Id.* at 5. In evaluating a social security applicant's statements regarding his or her pain or other symptoms, an ALJ is required to go through a two-step evaluation process. *See* 20 CFR § 404.1529(b), (c); 20 CFR 416.929 (b), (c); and SSR 96-7p. First, the ALJ must consider "whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the [applicant]'s pain or other symptoms." SSR 96-7p. Second, if a medically determinable physical or mental impairment "that could reasonably be expected to produce the [applicant]'s pain or other symptoms has been shown, the [ALJ] must evaluate the intensity, persistence, and limiting effects of the [applicant]'s symptoms to determine the extent to which the symptoms limit the [applicant]'s ability to do basic work activities." *Id.*

With regard to the second step, "whenever the [applicant]'s statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the [applicant]'s statements based on a consideration of the entire case record." SSR 96-7p. In addition to the objective medical evidence, the ALJ must consider other types of evidence such as: 1) "[t]he [applicant]'s daily activities;" 2) "[t]he location, duration, frequency, and intensity of the individual's pain or other symptoms;" 3) "[f]actors that precipitate and aggravate the symptoms;" 4) "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;" 5) "[t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms;" 6) "[a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms . . . ; and" 7) "[a]ny other factors concerning the

17

individual's functional limitations and restrictions due to pain or other symptoms." *Id.*; *see also Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) ("The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life.").

An ALJ may not disregard a claimant's allegations of pain and other symptoms with "a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p. Instead, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record. . . ." *Id.* While "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence," SSR 96-7p, "a claimant's testimony may be rejected if it is inconsistent with the objective medical evidence." *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005).

The Magistrate Judge found that the ALJ's failed to "enumerate the specific impairments or symptoms he concluded could reasonably be expected to be caused by [Plaintiff]'s medically determinable impairments." Report and Recommendation at 10. Social Security Regulation 96-7p contains no requirement that an ALJ enumerate the impairments or symptoms that could reasonably be expected to be caused by the Plaintiff's medically determinable impairments. *See* SSR 96-7p. Moreover, the ALJ's statement that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" implies that the ALJ accepted all of Plaintiff's claimed symptoms as reasonably caused by Plaintiff's medically determinable impairments.

The Magistrate Judge also found that the ALJ "provided inconsistent findings[1] and then relied purely on the medical evidence as the bench mark for determining the plaintiff's credibility." Report and Recommendation at 11 (citing R. at 18). The ALJ determined that Plaintiff's impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but that Plaintiff's claims with regard to the intensity, persistence, and limiting effects of these symptoms were not credible. R. at 15.

The ALJ's assessment of Plaintiff's credibility, as it was explained, is not supported by substantial evidence. Although the ALJ found that Plaintiff's pain is inconsistent with the medical evidence of record, the ALJ did not detail why the Collateral Questionnaire completed by Plaintiff's daughter was inconsistent with the medical evidence as a whole. In addition, the ALJ's finding that Plaintiff was not prescribed any medications for foot and leg pain does not take into account the entire medical record. Plaintiff's records from Family MedCenters of Aiken indicate that Plaintiff was prescribed Neurontin and Lyrica for her neuropathy and that this medication was not successful in addressing Plaintiff's pain from neuropathy, as evidenced by the repeated changes in Plaintiff's dosage. In addition, Plaintiff's diabetic foot care medical records indicate that Plaintiff was prescribed Metanx for the burning in her feet. Plaintiff's medical records also reveal that Plaintiff did, in fact, report a fall during an appointment at the Family MedCenters of Aiken on January 22,

---

[1] The court does not agree that the ALJ's findings were inconsistent. In making his credibility determination, the ALJ first stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." R. at 15. The ALJ went on to state that: "[t]he medical evidence in this case doe [sic] not reveal significant objective medical evidence of 'severe' impairments reasonably expected to cause the pain the claimant alleges she suffers." R. at 18. The ALJ concluded that: "[t]he claimant's alleged pain is disproportionate to the medical evidence of record." Id. These statements indicate that although the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the claimed symptoms and pain, the level of pain alleged by Plaintiff was not credible.

2007. R. at 256. The medical record in this case indicates on the whole that Plaintiff has consistently had difficulties with her neuropathy. As such, the ALJ's finding that Plaintiff's testimony with regard to the intensity, persistence, or functionally limiting effects of pain or other symptoms was inconsistent with the medical record, as explained, is not supported by substantial evidence. Because the ALJ did not properly assess Plaintiff's credibility as required by SSR 96-7p, the case is remanded to the ALJ for a new assessment of Plaintiff's credibility, taking all of the evidence into account. The ALJ should then need to reassess Plaintiff's residual functional capacity in light of the new credibility determination.

**B.     Hypothetical Question Posed to the VE**

Plaintiff contends that ALJ's hypothetical question to the VE did not match the restrictions detailed in the RFC assessment. Specifically, Plaintiff claims that the ALJ determined in the RFC assessment that Plaintiff must avoid "all jobs that would require exposure to dust, fumes and chemicals," Pl. Brief at 27, but that the hypothetical question posed to the VE only contemplated a restriction involving work around "excessive" dust, fumes and chemicals, which indicates a less significant restriction. *Id.* at 28.

"In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record." *Hailey v. Commissioner*, 284 F. App'x 100, 105 (4th Cir. 2008) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989)). In the RFC assessment, the ALJ stated that Plaintiff needed to "avoid[] exposure to dust, fumes and chemicals." However, the question posed to the VE asked the VE only to eliminate jobs involving "excessive" dust, fumes and chemicals. Because the ALJ's RFC assessment is more restrictive than the hypothetical question posed to the VE, the VE did not consider all of the evidence of Plaintiff's impairments in giving an

opinion as to whether there were jobs in the national economy that Plaintiff could work. Therefore, the ALJ could not rely on the VE's testimony that there were jobs in the national economy that Plaintiff could perform in determining that Plaintiff was not disabled based upon her RFC. The court also notes that the DOT descriptions for the jobs that the VE testified Plaintiff could perform; telephone clerk (DOT 235.662-022), appointment clerk (DOT 237.367-010), and circulation clerk (DOT 209.362-010); do not indicate whether or not these jobs involve exposure to dust, fumes, and chemicals. As a result, the court cannot assess the ALJ's determination that there are jobs that exist in significant numbers in the national economy that the claimant can perform. The case is therefore remanded for further action by the Commissioner on this issue.

## CONCLUSION

The court declines to adopt the Report and Recommendation of the Magistrate Judge. The Commissioner's decision is reversed and remanded under 42 U.S.C. §§ 405(g) and 1383(c)(3) for: 1) reassessment of Plaintiff's credibility, 2) an RFC assessment taking Plaintiff's credibility into account, and 3) a determination of whether there are jobs that exist in significant numbers in the national economy that the claimant can perform.

**IT IS SO ORDERED.**

s/ Margaret B. Seymour<br>
Margaret B. Seymour<br>
United States District Judge

February 22, 2011
Columbia, South Carolina